OPINION OF THE COURT
 

 Bellacosa, J.
 

 The issue in this appeal is whether the appellant attorney violated the Code of Professional Responsibility by repeatedly using special nonrefundable retainer fee agreements with his clients. Essentially, such arrangements are marked by the payment of a nonrefundable fee for specific services, in advance and irrespective of whether any professional services are actually rendered. The local Grievance Committee twice warned the lawyer that he should not use these agreements. After a third complaint and completion of prescribed grievance proceedings, the Appellate Division suspended the lawyer from practice for two years. It held that the particular agreements were per se violative of public policy. We affirm the order of the Appellate Division.
 

 L
 

 In 1990, the petitioner, Grievance Committee for the Tenth Judicial District, initiated a disciplinary proceeding charging attorney Cooperman with 15 specifications of professional misconduct. They relate to his use of three special nonrefundable retainer fee agreements.
 

 
 *470
 
 The first five charges derive from a written fee agreement to represent an individual in a criminal matter. It states: "My minimum fee for appearing for you in this matter is Fifteen Thousand ($15,000.00) Dollars. This fee is not refundable for any reason whatsoever once I file a notice of appearance on your behalf’. One month after the agreement, the lawyer was discharged by the client and refused to refund any portion of the fee. The client filed a formal complaint which the Grievance Committee forwarded to Cooperman for a response. Cooperman had already received a Letter of Caution not to use nonrefundable retainer agreements, and while this new complaint was pending, Cooperman was issued a second Letter of Caution admonishing him not to accept the kind of fee arrangement at issue here. He rejected the admonition, claiming the fee was nonrefundable.
 

 Charges 6 through 10 refer to a written retainer agreement in connection with a probate proceeding. It states in pertinent part: "For the minimal pee and non-refundable amount of Five Thousand ($5,000.00) Dollars, I will act as your counsel”. The agreement further provided: "This is the minimum fee no matter how much or how little work I do in this investigatory stage * * * and will remain the minimum fee and not refundable even if you decide prior to my completion of the investigation that you wish to discontinue the use of my services for any reason whatsoever.” The client discharged Cooperman, who refused to provide the client with an itemized bill of services rendered or refund any portion of the fee, citing the unconditional nonrefundable fee agreement.
 

 The last five charges relate to a fee agreement involving another criminal matter. It provides: "The minimum fee for Mr. Cooperman’s representation * * * to any extent whatsoever is Ten Thousand ($10,000.00) Dollars. * * * The above amount is the minimum fee and will remain the minimum fee no matter how few court appearances are made * * *. The minimum fee will remain the same even if Mr. Cooperman is discharged.” Two days after execution of the fee agreement, the client discharged Cooperman and demanded a refund. As with the other clients, he demurred.
 

 Cooperman’s persistent refusals to refund any portion of the fees sparked at least three separate client complaints to the Grievance Committee. In each case, Cooperman answered the complaint but refused the Grievance Committee’s suggestion for fee arbitration. Thereafter, the Grievance Committee sought authorization from the Appellate Division, Second
 
 *471
 
 Department, to initiate formal disciplinary proceedings against Cooperman. It tendered an array of arguments that these retainer agreements are unethical because, first, they violate the lawyer’s obligation to "refund promptly any part of a fee paid in advance that has not been earned” (Code of Professional Responsibility DR 2-110 [A] [3]). Further, the agreements create "an impermissible chilling effect upon the client’s inherent right upon public policy grounds to discharge the attorney at any time with or without cause,” in violation of DR 2-110 (B) (4). The petition also alleged that the fees charged by Cooperman were excessive in violation of DR 2-106 (A), and that he wrongfully refused to refund unearned fees in violation of DR 2-110 (A) (3). Finally, it notes that denominating the fee payment as nonrefundable constitutes misrepresentation (DR 1-102 [A] [4]).
 

 After an extensive hearing, the Referee made findings supporting violations on all 15 charges. On appropriate motion, the Appellate Division confirmed the Referee’s report with respect to charges 2 through 5, 7 through 10, and 12 through 15. The Court disaffirmed the report as to charges 1, 6 and 11, which alleged that the retainer agreements constituted deceit and misrepresentation. In sustaining the remaining charges, the Court held that these retainer agreements were unethical and unconscionable and "violative of an attorney’s obligations under the Code of Professional Responsibility to refund unearned fees upon his or her discharge” (187 AD2d 56, 57). The Court also concluded that Cooperman’s fees were excessive. The Court suspended him from the practice of law for a period of two years but did not order restitution.
 

 IL
 

 Whether special nonrefundable retainer fee agreements are against public policy is a question we left open in
 
 Jacobson v Sassower
 
 (66 NY2d 991, 994), a fee dispute case. We agree with the Appellate Division in this disciplinary matter that special nonrefundable retainer fee agreements clash with public policy and transgress provisions of the Code of Professional Responsibility
 
 (see,
 
 DR 2-110 [A] [3]; [B] [4]; 2-106 [A]), essentially because these fee agreements compromise the client’s absolute right to terminate the unique fiduciary attorney-client relationship.
 

 The particular analysis begins with a reflection on the nature of the attorney-client relationship. Sir Francis Bacon
 
 *472
 
 observed, "[t]he greatest trust between [people] is the trust of giving counsel” (Bacon,
 
 Of Counsel,
 
 in The Essays of Francis Bacon, at 181 [1846]). This unique fiduciary reliance, stemming from people hiring attorneys to exercise professional judgment on a client’s behalf — "giving counsel” — is imbued with ultimate trust and confidence
 
 (see, Rosner v Paley,
 
 65 NY2d 736, 738;
 
 Greene v Greene,
 
 56 NY2d 86, 92). The attorney’s obligations, therefore, transcend those prevailing in the commercial market place
 
 (compare, Meinhard v Salmon,
 
 249 NY 458, 463, 464). The duty to deal fairly, honestly and with undivided loyalty superimposes onto the attorney-client relationship a set of special and unique duties, including maintaining confidentiality, avoiding conflicts of interest, operating competently, safeguarding client property and honoring the clients’ interests over the lawyer’s
 
 (see, Matter of Kelly,
 
 23 NY2d 368, 375-376;
 
 see also,
 
 Brickman and Cunningham,
 
 Nonrefundable Retainers Revisited,
 
 72 NC L Rev 1, 6 [1993]). To the public and clients, few features could be more paramount than the fee — the costs of legal services
 
 (see, Jacobson v Sassower,
 
 66 NY2d 991, 993,
 
 supra).
 
 The Code of Professional Responsibility reflects this central ingredient by specifically mandating, without exception, that an attorney "shall not enter into an agreement for, charge, or collect an illegal or excessive fee” (DR 2-106 [A]), and upon withdrawal from employment "shall refund promptly any part of a fee paid in advance that has not been earned” (DR 2-110 [A] [3]). Accordingly, attorney-client fee agreements are a matter of special concern to the courts and are enforceable and affected by lofty principles different from those applicable to commonplace commercial contracts
 
 (see, Matter of Schanzer,
 
 7 AD2d 275,
 
 affd
 
 8 NY2d 972;
 
 Martin v Camp,
 
 219 NY 170).
 

 Because the attorney-client relationship is recognized as so special and so sensitive in our society, its effectiveness, actually and perceptually, may be irreparably impaired by conduct which undermines the confidence of the particular client or the public in general. In recognition of this indispensable desideratum and as a precaution against the corrosive potentiality from failing to foster trust, public policy recognizes a client’s right to terminate the attorney-client relationship
 
 at any time with or without cause (see, Matter of Dunn,
 
 205 NY 398, 402;
 
 Tenney v Berger,
 
 93 NY 524; DR 2-110 [B] [4]). This principle was effectively enunciated in
 
 Martin v Camp
 
 (219 NY 170,
 
 supra):
 
 "The contract under which an attorney is employed by a client has peculiar and distinctive features
 
 *473
 
 * * * [thus] [Notwithstanding the fact that the employment of an attorney by a client is governed by the contract which the parties make * * * the client with or without cause may terminate the contract at any time”
 
 (id.,
 
 at 172-174;
 
 compare, Denburg v Parker Chapin Flattau & Klimpl,
 
 82 NY2d 375;
 
 Cohen v Lord, Day & Lord,
 
 75 NY2d 95 [dealing conversely with economic consequences affecting the unfettered right to hire an attorney]).
 

 The unqualified right to terminate the attorney-client relationship at any time has been assiduously protected by the courts
 
 (see, Demon, Morris, Lenin & Shein v Glantz,
 
 53 NY2d 553;
 
 Andrewes n Haas,
 
 214 NY 255;
 
 see also, Matter of Krooks,
 
 257 NY 329, 331;
 
 Matter of Snyder,
 
 190 NY 66, 69). An attorney, however, is not left without recourse for unfair terminations lacking cause. If a client exercises the right to discharge an attorney after some services are performed but prior to the completion of the services for which the fee was agreed upon, the discharged attorney is entitled to recover compensation from the client measured by the fair and reasonable value of the completed services
 
 (see, Lai Ling Cheng n Modansky Leasing Co.,
 
 73 NY2d 454;
 
 Teichner n W & J Holsteins,
 
 64 NY2d 977;
 
 Matter of Montgomery,
 
 272 NY 323, 326). We have recognized that permitting a discharged attorney "to recover the reasonable value of services rendered in
 
 quantum meruit,
 
 a principle inherently designed to prevent unjust enrichment, strikes the delicate balance between the need to deter clients from taking undue advantage of attorneys, on the one hand, and the public policy favoring the right of a client to terminate the attorney-client relationship without inhibition on the other”
 
 (Demon, Morris, Lenin & Shein v Glantz,
 
 53 NY2d 553, 558,
 
 supra,
 
 citing
 
 Matter of Krooks,
 
 257 NY 329, 332,
 
 supra).
 

 Correspondingly and by cogent logic and extension of the governing precepts, we hold that the use of a special nonrefundable retainer fee agreement clashes with public policy because it inappropriately compromises the right to sever the fiduciary services relationship with the lawyer. Special nonrefundable retainer fee agreements diminish the core of the fiduciary relationship by substantially altering and economically chilling the client’s unbridled prerogative to walk away from the lawyer. To answer that the client can technically still terminate misses the reality of the economic coercion that pervades such matters. If special nonrefundable retainers are allowed to flourish, clients would be relegated to hostage
 
 *474
 
 status in an unwanted fiduciary relationship — an utter anomaly. Such circumstance would impose a penalty on a client for daring to invoke a hollow right to discharge. The established prerogative which, by operation of law and policy, is deemed not a breach of contract is thus weakened
 
 (see, Matter of Krooks,
 
 257 NY 329,
 
 supra; Martin v Camp,
 
 219 NY 170, 174,
 
 supra).
 
 Instead of becoming responsible for fair value of actual services rendered, the firing client would lose the entire "nonrefundable” fee, no matter what legal services, if any, were rendered. This would be a shameful, not honorable, professional denouement. Cooperman even acknowledges that the essential purpose of the nonrefundable retainer was to prevent clients from firing the lawyer, a purpose which, as demonstrated, directly contravenes the Code and this State’s settled public policy in this regard.
 

 Nevertheless, Cooperman contends that special nonrefundable retainer fee agreements should not be treated as per se violations unless they are pegged to a "clearly excessive” fee. The argument is unavailing because the reasonableness of a particular nonrefundable fee cannot rescue an agreement that impedes the client’s absolute right to walk away from the attorney. The termination right and the right not to be charged excessive fees are not interdependent in this analysis and context. Cooperman’s claim, in any event, reflects a misconception of the nature of the legal profession by turning on its head the axiom that the legal profession "is a learned profession, not a mere money-getting trade” (ABA Formal Opn No. 250).
 

 DR 2-110 (A) and (B) of the Code of Professional Responsibility add further instruction to our analysis and disposition:
 

 "Withdrawal from Employment
 

 "(A) In general. * * *
 

 "(3) A lawyer who withdraws from employment shall refund promptly any part of a fee paid in advance that has not been earned.
 

 "(B) Mandatory withdrawal.
 

 "A lawyer representing a client before a tribunal, with its permission if required by its rules, shall withdraw from employment, and a lawyer representing a client in other matters shall withdraw from employment, if: * * *
 

 "(4) [The lawyer] is discharged by [the] client.”
 

 
 *475
 
 We believe that if an attorney is prohibited from keeping any part of a prepaid fee that has not been earned because of discharge by the client, it is reasonable to conclude also that an attorney may not negotiate and keep fees such as those at issue here. In each of Cooperman’s retainer agreements, the Appellate Division found that the lawyer transgressed professional ethical norms. The fee arrangements expressed an absoluteness which deprived his clients of entitlement to any refund and, thus, conflicted with DR 2-110 (A) (3).
 

 Since we decide the precise issue in this case in a disciplinary context only, we imply no views with respect to the wider array of factors by which attorneys and clients may have fee dispute controversies resolved. Traditional criteria, including the factor of the actual amount of services rendered, will continue to govern those situations
 
 (see,
 
 DR 2-106 [B]). Thus, while the special nonrefundable retainer agreement will be unenforceable and may subject an attorney to professional discipline, quantum meruit payment for services actually rendered will still be available and appropriate.
 

 Notably, too, the record in this case contradicts Cooper-man’s claim that he acted in "good faith”. He urges us to conclude that he "complied with the limited legal precedents at the time.” The conduct of attorneys is not measured by how close to the edge of thin ice they skate. The measure of an attorney’s conduct is not how much clarity can be squeezed out of the strict letter of the law, but how much honor can be poured into the generous spirit of lawyer-client relationships. The "punctilio of an honor the most sensitive”
 
 (Meinhard v Salmon,
 
 249 NY, at 464,
 
 supra)
 
 must be the prevailing standard. Therefore, the review is not the reasonableness of the individual attorney’s belief, but, rather, whether a "reasonable attorney, familiar with the Code and its ethical strictures, would have notice of what conduct is proscribed”
 
 (Matter of Holtzman,
 
 78 NY2d 184, 191). Cooperman’s level of knowledge, the admonitions to him and the course of conduct he audaciously chose do not measure up to this necessarily high professional template. He even acknowledged at his disciplinary hearing that he knew that "there were problems with the nonrefundability of retainers”. Cooperman’s case, therefore, constitutes a daring test of ethical principles, not good faith. He failed the test, and those charged with enforcing transcendent professional values, especially the Appellate Divisions, ought to be sustained in their efforts.
 

 
 *476
 
 Our holding today makes the conduct of trading in special nonrefundable retainer fee agreements subject to appropriate professional discipline. Moreover, we intend no effect or disturbance with respect to other types of appropriate and ethical fee agreements
 
 (see,
 
 Brickman and Cunningham,
 
 Nonrefundable Retainers Revisited,
 
 72 NC L Rev 1, 6 [1993]). Minimum fee arrangements and general retainers that provide for fees, not laden with the nonrefundability impediment irrespective of any services, will continue to be valid and not subject in and of themselves to professional discipline.
 

 The Court is also mindful of the arguments of some of the
 
 amici curiae
 
 concerned about sweeping sequelae from this case in the form of disciplinary complaints or investigations that may seek to unearth or examine into past conduct and to declare all sorts of unobjectionable, settled fee arrangements unethical. We are confident that the Appellate Divisions, in the highest tradition of their regulatory and adjudicatory roles, will exercise their unique disciplinary responsibility with prudence, so as not to overbroadly brand past individualized attorney fee arrangements as unethical, and will, instead, fairly assess the varieties of these practices, if presented, on an individualized basis. Therefore, we decline to render our ruling prospectively, as requested
 
 (see,
 
 Schaefer,
 
 The Control of "Sunbursts": Techniques of Prospective Overruling,
 
 Cardozo Memorial Lecture, delivered before the Association of the Bar of the City of New York [Apr. 13, 1967], reprinted in 22 Record of Assn of Bar of City of NY 394, 403, 407-408;
 
 Great N. Ry. v Sunburst Co.,
 
 287 US 358, 364-365).
 

 We have examined appellant’s other contentions and conclude that they are without merit.
 

 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Judges Simons, Smith, Levine and Ciparick concur; Chief Judge Kaye and Judge Titone taking no part.
 

 Order affirmed, with costs.