**GALA ENTERPRISES, INC., Plaintiff,**

v.

**HEWLETT PACKARD COMPANY, Defendant.**

**HEWLETT PACKARD COMPANY, Counterclaim–Plaintiff,**

v.

**GALA ENTERPRISES, INC. and Al Mascolo, Counterclaim–Defendants.**

**No. 96 Civ. 4864 (DC).**

United States District Court, S.D. New York.

May 28, 1997.

Fischbein, Badillo, Wagner, Harding by Harold J. Ruvoldt, Jr., New York City, for Plaintiff/Counterclaim-Defendant Gala Enterprises, Inc.

Fleming, Roth & Fettweis by Cathy Fleming, Newark, NJ, for Counterclaim–Defendant Albert Mascolo.

Kavanagh, Peters, Powell & Osnato by Ronald G. Blum, New York City, and George L. O'Connell, Robin R. Raff, Sacramento, CA, for Defendant/Counterclaim-Plaintiff Hewlett Packard Company.

### MEMORANDUM DECISION AND ORDER

CHIN, District Judge.

Hewlett Packard Company ("Hewlett Packard") moves for an order directing that certain transfers of funds from the bank accounts of Gala Enterprises, Inc. ("Gala") to

the law firms of Fischbein Badillo Wagner Harding ("Fischbein Badillo") and Fleming Roth & Fettweis ("Fleming Roth") be subject to an order of attachment, temporary restraining order, and preliminary injunction previously entered by the Court in this case.

At issue are three transfers: (1) $500,000 paid to Fischbein Badillo for fees; (2) $270,000 advanced to Fischbein Badillo for disbursements; and (3) $150,000 paid to Fleming Roth for fees and disbursements. Hewlett Packard contends that these funds are subject to attachment either because Gala retains an interest in the funds or because the transfers constituted fraudulent conveyances.

For the reasons that follow, I hold that: (1) factual issues exist with respect to whether the $500,000 or some portion thereof was fraudulently conveyed; (2) the $270,000, or at least a portion thereof, is subject to attachment as the clients have retained an interest in the funds; and (3) the $150,000 is not subject to attachment because Gala has not retained an interest in the funds and the funds were not fraudulently conveyed.

### THE FACTS

#### A. *Background*

From the fall of 1995 through the spring of 1996, Gala sold certain computer parts to Hewlett Packard. These purchases were negotiated in part by Jason Turner, an employee of Hewlett Packard, who allegedly was receiving money and other things of value from Gala and its principals, unbeknownst to Hewlett Packard. Gala contends that it shipped computer parts to Hewlett Packard, for which it has only been paid in part. Hewlett Packard contends that it paid more than $1.7 million to Gala for parts that were either overpriced or never shipped at all.

On May 9, 1996, Gala mailed Hewlett Packard a statement of account, reflecting an indebtedness for computer parts of $287,000. Hewlett Packard refused to pay the bill. Consequently, Gala brought this action on June 3, 1996 in the Supreme Court for the State of New York. Hewlett Packard removed the case to this Court and filed an Answer with Counterclaims, alleging that

Gala and two of its employees, Abbott Solomon and Albert Mascolo, conspired with Turner to defraud Hewlett Packard. Hewlett Packard also filed a motion for a temporary restraining order and an order of attachment, which I granted on June 27, 1996. At a hearing on August 13, 1996, I confirmed the attachment order and granted a preliminary injunction.

In the meantime, on April 8, 1996, Turner was arrested and charged with grand larceny for his involvement with these transactions. He is currently being prosecuted by the United States Attorney's Office for the Eastern District of California. On September 19, 1996, the same United States Attorney's Office obtained indictments against Mascolo and Solomon. Ms. Fleming, of the Fleming Roth firm, is currently counsel for Mascolo, and Mr. Ruvoldt, of the Fischbein Badillo firm, is currently counsel for Solomon in the criminal case, *United States v. Abbott Solomon and Albert Mascolo*, No. CR–5–96–397 WBS (E.D.Cal.). On April 28, 1997, Mascolo was convicted on 15 counts.

#### B. *The Transfers*

Three transfers are at issue. They are:

1) $500,000 transferred on April 10, 1996, from Gala's bank accounts ($40,000 from a European American Bank ("EAB") account and $460,000 from a Citibank account) to Fischbein Badillo; these funds were initially placed into Fischbein Badillo's client escrow account, but were then transferred on April 12, 1996 to its operating account. (Blum Decl. Ex. C, D, & E, at 5).

2) $270,000 transferred on June 14, 1996, to a "Fischbein Badillo Trust Account" from Gala's EAB account via a check to Fischbein Badillo and signed by Mascolo. (Blum Decl. Ex. F).

3) $150,000 transferred on April 26, 1996, to Fleming Roth's business account via wire transfer from Gala's EAB account for representation of Mascolo. (Blum Decl. Ex. G).

Hewlett Packard alleges that after Turner's arrest on April 8, 1995, Mascolo and Solomon withdrew approximately $370,500 from Gala's account by writing checks written to themselves and to cash. Hewlett

Packard further contends that Gala's only assets at this time are the funds held by Fischbein Badillo and Fleming Roth.

## C. The Retainer Agreements

### 1. Fischbein Badillo

#### a) The $500,000

The $500,000 was paid to Fischbein Badillo pursuant to a retainer agreement dated April 10, 1996. Fischbein Badillo has submitted a redacted copy of the agreement for the Court's in camera review. The agreement has been redacted to eliminate the names of the clients, and Fischbein Badillo has stated in its papers that, even though the money came from Gala's bank accounts, "[Hewlett Packard] assumes incorrectly the Fee was paid with Gala's funds." (Gala Mem. at 2).[1] According to Gala's attorneys, the agreement was redacted and submitted in camera "for the purpose of protecting communications between attorney and client and the individual clients' Fifth Amendment rights against self-incrimination." (*Id.* at 1 n. 1).

The agreement describes the scope of representation as covering "any and all matters relating to the transactions of Gala Enterprises Inc. with Hewlett–Packard Inc. including all corporate, civil and criminal matters." It provides for a "retainer fee" of $500,000, which is described as "a fixed fee for legal services." It further states:

> This fee has been set in consideration of the complexities of the matter, the possibility of multiple partners being involved[,] the fact that multiple jurisdictions and areas of the law will be involved and the fact, among others, that upon its execution a number of other matters scheduled to be handled by partners and associates assigned to this matter must be reassigned and or foregone.

The agreement clarifies that the $500,000 is for fees only and was not inclusive of disbursements, which were to be billed and reimbursed separately. The agreement also identified two Fischbein Badillo partners who were to be made "available to perform any legal services that arise during the next twelve months."

The agreement is silent as to the refundability of the $500,000 or any portion thereof.[2]

#### b) The $270,000

The $270,000 was deposited into one of Fischbein Badillo's trust accounts on June 14, 1996. There apparently was no written agreement entered into between Fischbein Badillo and its clients specifically with respect to these funds, although the April 10, 1986 retainer agreement does provide for the clients to be responsible for disbursements. The retainer agreement did not contemplate payment of expenses in advance, however, as it provided that Fischbein Badillo would tender bills for expenses on a monthly basis, which bills were "due and payable upon receipt."

### 2. Fleming Roth

Fleming Roth, a New Jersey law firm, was retained "officially" on April 26, 1996 to represent Mascolo. It is not clear whether there was a written retainer agreement, but Fleming Roth has represented that the agreement provided for a "fixed fee" of $150,000, inclusive of expenses. Pursuant to the agreement, Fleming Roth was obliged to represent Mascolo both in the criminal grand jury investigation and in the resulting criminal case in the Eastern District of California. In addition, Fleming Roth has appeared on behalf of Mascolo in the instant case.

Fleming Roth has not indicated whether any provision was made in the agreement with respect to refundability of the $150,000 or any portion thereof. The firm does state that if its services were to be terminated, Mascolo would have a "potential future interest" in any portion of the money exceeding

---

**1.** This statement, however, is contradicted by a statement made by counsel for Gala at the August 13, 1996 hearing: "Gala paid a $500,000 legal fee for services to be performed for the corporation in connection with the criminal investigation." (Tr. 18).

**2.** In its papers, Fischbein Badillo argues that the fee was refundable. At the August 13, 1996 hearing, however, Fischbein Badillo took a contrary position, stating that the "$500,000 is not going to be returned to Gala nor to Hewlett Packard. It's the property of the firm and we intend to keep it...." (Tr. at 23).

the quantum meruit value of the services rendered to that point.

### DISCUSSION

Hewlett Packard contends that the three transfers of funds to the two law firms are subject to the attachment and other orders entered in this case because the funds represent monies that Gala "stole" from it. Hewlett Packard contends further that the monies are subject to attachment because they are funds in which Gala has an interest. In particular, it argues that both Fischbein Badillo's retainer agreement (providing for the $500,000 fee) and Fleming Roth's retainer agreement (providing for the $150,000 fee) are unenforceable because they are nonrefundable retainer fee agreements that violate the Code of Professional Responsibility. *See In re Cooperman*, 83 N.Y.2d 465, 611 N.Y.S.2d 465, 468–70, 633 N.E.2d 1069 (1994). Alternatively, Hewlett Packard argues that the three transfers are "fraudulent conveyances" that must be set aside.

I will discuss each of the three transfers separately. Before doing so, I will discuss the applicable legal standards governing attachments, attorney retainer agreements, and fraudulent conveyances.

### A. *Applicable Legal Standards*

#### 1. *Standards for Attachment*

Attachment serves "to provide security for the enforcement of any money judgment which may be recovered by the plaintiff in the main action." 29 N.Y. Jur.2d, Creditors' Rights § 16 (1983). As a general matter, Fed.R.Civ.P. 64 permits attachment "under the circumstances and in the manner provided by the law of the state in which the district court is held." Under section 6202 of the New York Civil Practice Law and Rules, "[a]ny debt or property against which a money judgment may be enforced as provided in section 5201 is subject to attachment." CPLR § 6202 (McKinney 1980).

Section 5201(b) generally describes what property may be subject to enforcement of a judgment (and hence subject to attachment):

A money judgment may be enforced against any property which could be assigned or transferred, whether it consists of a present or future right or interest and whether or not it is vested, unless it is exempt from application to the satisfaction of the judgment.

CPLR 5201(b) (McKinney 1978).

■ Section 5201(a) addresses the specific situation of when a debt owed by a third party to the judgment debtor is subject to enforcement by a judgment creditor. Section 5201(a) provides in part:

A money judgment may be enforced against any debt, which is past due or which is yet to become due, certainly or upon demand of the judgment debtor ... unless it is exempt from application to the satisfaction of the judgment....

CPLR 5201(a) (McKinney 1978).

In his Practice Commentaries, Professor Siegel explains what is meant by the words "which is past due or which is yet to become due, certainly or upon demand of the judgment debtor." He writes:

To qualify for application to the judgment under subdivision (a), the debt must be "past due" or certain to become due either "upon demand" or by the mere passage of time. If it depends on a contingency, in other words, and if the contingency is not one certain to arise, such as an event which may not happen, the purpose of subdivision (a) is to exclude the debt from levy. The aim is to prevent the court from being embroiled in disputes about intangible property interests which may never achieve economic significance....

CPLR 5201, Practice Commentary 5201:1, at 50 (McKinney 1978). *See Sheehy v. Madison Square Garden Corp.*, 266 N.Y. 44, 193 N.E. 633 (1934) (holding that "an indebtedness is not attachable unless it is absolutely payable at present or in the future, and not dependable upon any contingency") (quoting *Herrmann & Grace v. City of New York*, 130 A.D. 531, 114 N.Y.S. 1107, 1110 (1st Dep't 1909), *aff'd mem.*, 199 N.Y. 600, 93 N.E. 376 (1910)); *Glenmore Distilleries Co. v. Seideman*, 267 F.Supp. 915, 918 (E.D.N.Y.1967) (an "inchoate, uncertain and contested" claim is not a debt "which 'is ... to become due, certainly

or upon demand,'" subject to levy under CPLR 5201).

Generally, "real property and interests therein, as well as tangible personal property and interests therein, are subject to attachment." 29 N.Y. Jur.2d, Creditor's Rights, § 107. For example, an attachment may be levied on a vested remainder or an equitable interest in land. *Id.* Funds that belong to the defendant but are in the hands of another may also be attached, such as money in a bank account. *Id.* § 113.

■ Funds placed into an escrow account are likewise subject to attachment. As a general matter, funds kept in an escrow account, such as an Interest on Lawyer Account (an "IOLA" account), are funds of the client held by the attorney in his fiduciary capacity. *In re Niles,* 207 A.D.2d 50, 620 N.Y.S.2d 133, 134 (2d Dep't 1994) ("As an escrow account, the IOLA account can contain only client funds, and they are held by the attorney who maintains the account in his fiduciary capacity."). Escrow accounts may be subject to writs of attachment because the debtor retains sufficient control over the funds to render the funds subject to execution. *Koroleski v. Badler,* 32 A.D.2d 810, 303 N.Y.S.2d 221 (2d Dep't 1969); *see also Astrea United Investments, L.P. v. B.T. Onitiri,* No. 92 Civ. 0581, 1992 WL 346353, at *3 (S.D.N.Y. Nov.18, 1992) ("Attachment is available to reach funds in escrow accounts . . . [under] the CPLR.").

■ In *Koroleski,* the court found the judgment debtor's interest in the escrow account sufficient to permit attachment where the balance of the funds were to be returned to the debtor after satisfaction of all debts. 303 N.Y.S.2d at 222–23. The mere fact that the escrow account is being held by a defendant's lawyer does not preclude attachment. *U.R.C., Inc. v. Applied Images, Inc.,* 106 Misc.2d 1034, 431 N.Y.S.2d 859, 860 (Sup.Ct. Nassau Cty.1980). In determining attachability, the *U.R.C.* court held that under New York law, a defendant has an "interest" in the funds if "any part of [the money is] within the present or future control of the defendant." *Id.* 431 N.Y.S.2d at 862.

### 2. *Nonrefundable Retainer Agreements*

The leading case on the propriety of nonrefundable retainer agreements is *In re Cooperman,* in which the New York State Court of Appeals held that special nonrefundable retainer fee agreements are unenforceable because they "compromise the client's absolute right to terminate the unique fiduciary attorney-client relationship." 83 N.Y.2d 465, 611 N.Y.S.2d 465, 467, 633 N.E.2d 1069, 1071 (1994).

The court defined a special nonrefundable retainer as one "marked by the payment of a nonrefundable fee for specific services, in advance and irrespective of whether any professional services are actually rendered." 611 N.Y.S.2d at 466, 633 N.E.2d at 1070. The nonrefundability of the retainer in *Cooperman* was clearly stated, as the retainer read in part:

> For the MINIMAL FEE and NON–REFUNDABLE amount of Five Thousand ($5,000) Dollars, I will act as your counsel. . . . This is the minimum fee no matter how much or how little work I do in this investigatory stage . . . and will remain the minimum fee and not refundable even if you decide prior to my completion of the investigation that you wish to discontinue the use of my services for any reasons whatsoever.

*Id.*[3]

The *Cooperman* court thus held that:

> the use of a special nonrefundable retainer fee agreement clashes with public policy because it inappropriately compromises the right to sever the fiduciary services relationship with the lawyer. Special nonrefundable retainer fee agreements dimin-

---

**3.** Recognizing the special fiduciary nature of the relationship between attorney and client, the court observed that "[t]he attorney's obligations . . . transcend those prevailing in the commercial marketplace. . . ." 611 N.Y.S.2d at 467, 633 N.E.2d at 1071. Those obligations, as embodied in the Code of Professional Responsibility, pro-

hibit an attorney from "enter[ing] into an agreement for, charg[ing], or collect[ing] an illegal or excessive fee," DR 2–106(A), and require an attorney, upon withdrawal from employment, to "refund promptly any part of a fee paid in advance that has not been earned." DR 2–110(A)(3).

ish the core of the fiduciary relationship by substantially altering and economically chilling the client's unbridled prerogative to walk away from the lawyer.

611 N.Y.S.2d at 468, 633 N.E.2d at 1072. The court specifically excepted from its ruling, however, "[m]inimum fee arrangements and general retainers that provide for fees, not laden with the nonrefundability impediment irrespective of any services...." *Id.* at 470, 633 N.E.2d at 1074.

While the *Cooperman* court did not explain the difference between an impermissible special nonrefundable retainer agreement and a permissible "general retainer," Judge Glasser explored these issues more fully in *Wong v. Michael Kennedy, P.C.*, 853 F.Supp. 73, 78 (E.D.N.Y.1994). Applying the principles set forth in *Cooperman*, Judge Glasser held as unenforceable a retainer agreement that provided that, if the lawyer's services were terminated, "any fee actually paid on or prior to the date of such termination shall be deemed earned and no part thereof shall be refundable." 853 F.Supp. at 76. Judge Glasser explained the differences between a "special retainer" and a "general retainer." A special retainer is:

> an agreement between attorney and client pursuant to which the client contracts to pay a specified fee in exchange for specified services; the fee may be calculated on an hourly percentage or other basis, and may be payable in advance or as billed.

853 F.Supp. at 79. In contrast, a general agreement is:

> an agreement pursuant to which the client agrees to pay the attorney a fixed sum in exchange for the attorney's promise to be available to perform, at an agreed price, any legal services ... that arise during a specified period. *Because the general retainer fee is given in exchange for availability, it is a charge separate from fees incurred for services actually rendered.*

*Id.* (emphasis added).

At least one commentator has expressed the view that even a general retainer violates the principles espoused in *Cooperman* if it provides that the fee is nonrefundable. P.S. Kunen, *No Leg To Stand On: The General Retainer Exception To the Ban on Nonre-* *fundable Retainers Must Fall*, 17 Cardozo L.Rev. 719 (1996). Under this view, an attorney should not be permitted to retain a fee, simply because it is paid as part of a general retainer, if the representation terminates prematurely—if, for example, the attorney agreed to be available for twelve months but the attorney-client relationship was severed after just two months.

### 3. *Fraudulent Conveyances*

■ Hewlett Packard also argues that the transfers to the law firms should be set aside under the New York Uniform Fraudulent Conveyance Act ("UFCA"), N.Y. Debt. & Cred. Law ("DCL") §§ 270–281 (McKinney 1990). Specifically, Hewlett Packard argues that these transfers were constructively fraudulent under § 273, which reads in pertinent part:

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

DCL § 273 (McKinney 1990). Subsection (a) provides in part:

> transfers of property are deemed fraudulent as to creditors and are voidable as a matter of law "without regard to ... actual intent" if they are made without "fair consideration" and the party making the transfer is insolvent or rendered insolvent.

DCL § 273–a (McKinney 1990). Thus, to prove that a transfer of funds was a fraudulent conveyance, a plaintiff must prove that (1) the defendant made a conveyance; (2) the defendant was or would have been rendered insolvent at the time of the conveyance; and (3) the conveyance was made without fair consideration. *United States v. McCombs*, 30 F.3d 310, 323 (2d Cir.1994).

■ Under the UFCA, "fair consideration" has been defined as "a fair equivalent" or an "amount not disproportionately small as compared with the value of the property, or obligation obtained [from the debtor]." *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 638 (2d Cir.1995) (citing DCL § 272). Thus

the court's role in determining "fair consideration" is to measure the economic benefit received from the entire transaction and then compare that to the value of the property transferred. *Id.* at 638–39. Generally, the burden for establishing the element of unfair consideration rests on the party asserting the claim of fraudulent conveyance. *Id.* at 323–24.

Hewlett Packard also relies on § 276 of New York's Debtor & Creditor Law in arguing that the conveyances here were fraudulent. Under § 276:

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

DCL § 276 (McKinney 1990).

## B. *The $500,000 to Fischbein Badillo*

Hewlett Packard contends that the $500,000 paid to Fischbein Badillo is property of Gala subject to attachment on two grounds: first, it argues that the retainer agreement is an unenforceable special nonrefundable retainer, and second, it alleges that the transfer of the funds to Fischbein Badillo was a fraudulent conveyance.

### 1. *The Retainer Agreement*

■ I find that the Fischbein Badillo retainer agreement is not a nonrefundable retainer agreement of the type prohibited by the court in *Cooperman.* Unlike the retainer agreement at issue in *Cooperman,* the language of the retainer agreement here is not "laden with the nonrefundability impediment." 611 N.Y.S.2d at 470, 633 N.E.2d at 1074. Indeed, there is no reference to refundability at all. Notwithstanding Fischbein Badillo's statements at the hearing to the contrary, the retainer agreement itself shows that it does not violate the principles enunciated in *Cooperman* because it does not purport to limit the clients' ability to obtain a refund if Fischbein Badillo's services are prematurely terminated. Clearly, if the firm's services were prematurely terminated at a point when the reasonable value of its services rendered to that point did not exceed $500,000, the clients would be entitled to a partial refund.

■ Nor does the fact that the fee is theoretically refundable in whole or part render the entire fee attachable. While it is true that the clients still retain a potential interest in the funds to the extent that some portion thereof would be refundable in the event that Fischbein Badillo's representation was terminated prematurely, such a potential interest in the money is insufficient to permit attachment of the entire fee. The "debt" that Fischbein Badillo would owe its clients in that event is not "absolutely payable at present or in the future." Rather, the existence and amount of the debt would turn on certain contingencies that surely would be disputed, including whether the firm's services were pre-maturely terminated and whether the reasonable value of services rendered to that point was less than $500,000. *Sheehy v. Madison Square Garden Corp.,* 266 N.Y. 44, 193 N.E. 633 (1934).

Under the terms of the retainer here, the fee was in essence a flat fee of $500,000, and unless the transfer were to be set aside for some other reason, the money became Fischbein Badillo's money the moment the fee was paid. The client's contingent future interest in that portion of the fee, if any, that would be refunded if the firm's services were prematurely terminated is not a sufficient basis for attaching the $500,000 fee now. Hence, Hewlett Packard's reliance on *Cooperman* fails.

### 2. *Fraudulent Conveyance*

As to Hewlett Packard's second argument, I find that the circumstances warrant holding an evidentiary hearing on whether the $500,000 transfer of funds to Fischbein Badillo was a fraudulent conveyance.

The $500,000 was transferred to Fischbein Badillo on April 10, 1996, just two days after Turner was arrested, on the heels of the uncovering of a scheme that was alleged to have defrauded Hewlett Packard of well in excess of a million dollars. The $500,000 represented a substantial portion of Gala's assets at the time (assuming the $500,000 in fact was Gala's money). At or about the

same time, Mascolo and Solomon apparently also withdrew another $370,500 by writing checks to themselves and to cash. And some two months later, another $270,000 was transferred to Fischbein Badillo by a check signed by Mascolo.

Fischbein Badillo has provided inconsistent information as to whose funds these were. At the hearing, the firm said the $500,000 were Gala's funds. Now, however, the firm suggests they are not Gala's funds. Fischbein Badillo also declines to identify who the clients are. The firm has also made inconsistent statements as to whether the funds were refundable. These inconsistencies certainly raise questions.

Moreover, while the parties disagree as to whether Gala was rendered insolvent by the three transfers in question, it cannot be disputed that the funds represented the bulk of Gala's assets. The fact that Gala would turn over so large a portion of its apparent assets to its lawyers surely raises questions as to its intent. In any event, a factual question exists as to whether the transfer of the $500,-000, together with the transfer of the $270,-000 in June 1996, rendered Gala insolvent.

A substantial question also exists as to whether the $500,000 was fair consideration for the services to be rendered. It is not even clear for whom the services were to be provided. It is impossible for me to make a judgment as to whether $500,000 was fair and reasonable without knowing what services were to be provided for whom. Gala, Mascolo and Solomon had not been indicted as of April 10, 1996, and although they surely were implicated, it was not clear at that point what services would be required on their behalf in the future.

I simply cannot determine at this juncture whether the fee arrangement in question—an upfront, flat fee of $500,000 together with an upfront payment of $270,000 for disburse-ments—was fair, reasonable, or customary for the type of services that the parties to the retainer agreement contemplated would be provided. In view of the suspiciousness of the circumstances, a hearing is warranted. The $500,000 is to be held in escrow by Fischbein Badillo pending a resolution of these issues.[4]

## C. *The $270,000 to Fischbein Badillo*

It is undisputed that Fischbein Badillo is currently holding the $270,000 received from Gala on June 14, 1996 for the payment of disbursements. (Gala Mem. at 29). That money, currently in a "Fischbein Badillo Trust Account," was described at the August 13, 1996 hearing by Mr. Kalban, counsel from Fischbein Badillo, as money held "in escrow against disbursements." (Tr. 19). At that time, Gala's counsel did not dispute that the $270,000 was subject to the Order of Attachment.[5] When the issue was raised by Hewlett Packard, Mr. Ruvoldt, also counsel from Fischbein Badillo, stated, "Mr. O'Connell [counsel for Hewlett Packard] is correct that $270,000 is being held in our trust account. . . . We have honored and continue to honor the attachments with regard to that." (Tr. 23).

In a change of heart, Gala now argues that the $270,000 is actually being held in a trust account "for the benefit of the firm in order to cover necessary expenses incurred during the course of litigation." (Gala Mem. at 30). Fischbein Badillo argues that because it is a "trustee" it has "acquired legal title to the money in its trust account." Therefore, Fischbein Badillo contends, Gala has only a "residuary interest" in the funds in whatever money remains in the account at the end of the litigation, not in the money currently in the account—even though that money is supposed to be used for expenses incurred by

---

4. Fischbein Badillo has also made certain constitutional arguments (Gala Mem. at 17), which I have considered but reject. First, it is simply unclear on whose behalf these arguments are being made, in part because the firm has refused to identify its clients. Second, it does not appear, in any event, that any of the parties or other individuals involved have been denied counsel of their choice.

5. The only issue raised by Gala at the hearing regarding the $270,000 was what amount Fischbein Badillo might be permitted to withdraw to pay for expenses incurred by the firm before August 13, 1996. (Tr. 23).

Fischbein Badillo on behalf of Gala. (*Id.* at 29–30).

The argument is without merit. The $270,000 was given to Fischbein Badillo for the benefit of *Gala,* not Fischbein Badillo, to cover expenses incurred during the course of litigation. Title to the money does not belong to Fischbein Badillo, as the firm itself admits that "any remaining balance held in the trust account would then be the property of the clients." (*Id.* at 30). Therefore, the money has always remained Gala's money, and within its control. There was no "contingency" as to whether this money was Gala's money. If the firm's services were terminated, Gala would have had an absolute right to the money back, less any amounts due for expenses already incurred. Thus, because Gala has had an "interest" in the $270,000 held by Fischbein Badillo and set aside for expenses it incurred, this money was subject to the writ of attachment.

Fischbein Badillo contends that the expenses it incurred from the initiation of representation on April 10, 1996 to the present should not be subject to the Order of Attachment. The contention is rejected, except as to expenses incurred prior to the issuance of the attachment order. Because property transferred before an order of attachment is not subject to the order, Fischbein Badillo may deduct any expenses incurred in connection with these matters until the issuance of the TRO and Order of Attachment on June 27, 1996. The balance of the $270,000, however, is subject to attachment.

Fischbein Badillo shall submit an accounting of all expenses incurred prior to June 27, 1996 to the Court and Hewlett Packard. If the parties can agree as to the appropriate amount to be applied to disbursements incurred prior to June 27, 1996, the parties may submit a stipulation authorizing Fischbein Badillo to deduct that amount. If the parties cannot agree as to the amount, I will resolve the disagreement. In the meantime, the entire $270,000 is to be held in escrow.

### D. *The $150,000 to Fleming Roth*

Hewlett Packard raises similar arguments regarding the attachability of the $150,000 paid to Fleming Roth. These arguments are rejected. First, I find that the $150,000 was not paid pursuant to an improper non-refundable retainer. Rather, the $150,000 was a flat fee subject to refund only if the services of Fleming Roth were prematurely terminated. For the reasons stated above, this possibility of a refund did not render the $150,000 attachable.

Second, I am persuaded that no basis exists for believing the $150,000 was fraudulently conveyed. The $150,000 was inclusive of fees and costs for representation of Mascolo in the criminal investigation and any criminal or civil case that followed. The parties certainly contemplated that there might be a criminal trial in California. Under these circumstances, the $150,000 was not excessive or unreasonable. As it turned out, of course, Mascolo was indicted and tried in California, and I have no doubt that Fleming Roth has rendered services and incurred costs for which a fee of $150,000 is fair consideration. Accordingly, I hold that the $150,000 paid to Fleming Roth is not subject to attachment in this case.

### CONCLUSION

For the foregoing reasons, Hewlett Packard's motion to attach the funds in question is denied in part and granted in part. A hearing will be held to determine whether the $500,000 or any part thereof was fraudulently conveyed to Fischbein Badillo. In the meantime, Fischbein Badillo will continue to hold the $500,000 in escrow subject to further order of the Court. The $270,000 held in escrow by Fischbein Badillo is subject to attachment, except that Fischbein Badillo may deduct therefrom the expenses incurred in connection with this matter prior to June 27, 1996 if the parties can stipulate to such an amount. Otherwise, the Court will determine what portion of the $270,000 may be transferred outright to Fischbein Badillo. The $150,000 paid to Fleming Roth is not subject to attachment.

A pretrial conference will be held on June 16, 1997 at 4:30 p.m. in Courtroom 11A, U.S. Courthouse, 500 Pearl Street to discuss the status of the case generally; the scope, format, and scheduling of a hearing on the

fraudulent conveyance issue and any other issues discussed herein; and discovery, including discovery on the matters relating to the fraudulent conveyance issue.

SO ORDERED.

