*782 OPINION OF THE COURT
Charles J. Markey, J.
The focus of this controversy is a written general-special hybrid retainer agreement between a law firm and a, now, former client. Such a fee arrangement has not been discussed by any reported New York state court case.
The Facts
Plaintiff Agusta & Ross (A&R) is a law firm with its offices located in Queens County. Defendant Trancamp Contracting Corp. (Trancamp) erroneously sued herein as “Tran Camp Contracting Corp.”[1] maintains its principal offices in Yonkers, Westchester County, New York.
On October 27, 2000, Michael J. Agusta, Esq., a principal of the plaintiff law firm, entered into an agreement (the agreement) with Albert A. Tranquillo, the president of Trancamp. In the agreement, A&R was named as “Special Outside General Counsel” of Trancamp. The agreement was broken down simply into two parts, “Legal Services to be Provided” and “Legal Services Not Included.”
A&R, in the legal services it agreed to provide, stated that it would provide “unlimited telephone consultations * * * on any existing or new legal matter which may arise,” would meet with the client on any new matter, will meet with the client quarterly to discuss “ongoing matters,” “will interface, as necessary with legal specialists” in order “to manage the cost of outside counsel,” “will assist you in receivable collections,” and will work with the client’s credit department to improve its procedures.
A&R, for “Legal Services Not Included,” singled out litigation, for which various fees were set forth. For instance, in the event of a collection case that was to be instituted in the Civil Court of the City of New York, plaintiff would take a contingency of 22% instead of the “standard 33%.” Regarding other litigations in which the client would be billed by the hour, Trancamp would pay $140 per hour instead of A&R’s “standard $250.00 hourly rate.”
The agreement stated: “For the above professional services to be rendered, our annual retainer shall be Twenty Five Thousand ($25,000.00) Dollars, payable quarterly, plus any *783 additional fees as described above, as they may arise from time to time.” Trancamp paid quarterly retainers on October 1, 2000 and January 1, 2001, each in the amount of $6,250.
At some point, although not specified anywhere, the relationship between the client and its attorneys collapsed, and by an endorsed complaint erroneously dated “February 30 [sic], 2002,” plaintiff instituted this action seeking the sum of $21,105.86. Defendant’s counterclaim seeks the sum of $212,000. In its counterclaim, contained in its answer dated March 8, 2002, Trancamp charges that A&R failed to perform any meaningful work for the plaintiff, received money for “no consideration,” filed a “false, fraudulent” charging hen in order to avoid turning over to Trancamp crucial papers and client files, and engaged in “gross overbilling [sic] and charges for nonexistent work.”
Plaintiff’s present motion is for dismissal of the defendant’s counterclaim. In support of the motion, Michael Agusta, Esq., contends: “The fees were earned where billed, and no specific services were required to be rendered.”
Defendant opposes the motion by submitting the affidavit of Mr. Tranquillo, its president.[2] Defendant expresses shock at Mr. Agusta’s above-quoted statement. Tranquillo further contends that Agusta made numerous representations that he would undertake aggressive collection efforts before resorting to litigation. Tranquillo maintains:
“The promise was made to me that there would be aggressive dunning and telephone pursuit of open accounts to collect open bills within much shorter periods of time than litigation required, and that this was a specialty of his firm, along with its experience in litigation. It is expressly for this reason that I agreed to pay him an annual retainer of $25,000, which was supposed to cover the cost of his diligent collection activities without litigation. He is not simply entitled to the money for his sweet smile.”
Defendant further maintains that in addition to the $12,500 admittedly received by A&R, Trancamp paid an additional $9,000, part of which was to meet a demand by A&R before it would return any of Trancamp’s papers.
*784 The Applicable Law
This case involves two significant issues, the parol evidence rule and the varying types of fee arrangements and their permissibility.
A. The Parol Evidence Rule
The statement in Tranquillo’s affidavit referring to his conversations with Agusta prior to signing the agreement implicates the parol evidence rule. Although this issue was not briefed by either side, the parol evidence rule bars “extrinsic evidence of a prior or contemporaneous oral agreement when offered to contradict, vary, add to, or subtract from the clear and unambiguous terms of a valid, integrated written instrument” (Regent Partners, Inc. v Parr Dev. Co., Inc., 960 F Supp 607, 615 [ED NY 1997]; Congress Fin. Corp. v John Morrell & Co., 790 F Supp 459, 468 [SD NY 1992]; see, e.g., New York TRW Tit. Ins. Co. v Wade’s Canadian Inn & Cocktail Lounge, 241 AD2d 845 [3d Dept], lv dismissed 91 NY2d 848 [1997]). However, although the parol evidence rule bars such extrinsic evidence to vary the terms of a plain and unambiguous agreement, “where there is ambiguity or uncertainty in the agreement, the intention of the parties leading up to and attending the execution of the writing is admissible to ascertain the intention of the parties” (Geary v Dade Dev. Corp., 62 AD2d 1083, 1084 [3d Dept 1978]; see, e.g., Phalen v Vineyard L.V., 256 AD2d 1055, 1057 [3d Dept 1998]).
Where an allegation of fraud is made, a court will not apply the parol evidence rule (see, e.g., Berger-Vespa v Rondack Bldg. Inspectors, 293 AD2d 838, 840 [3d Dept 2002]). In the present case, any veiled charge of fraud by the defendant is directed not to the execution of the agreement, but, rather, to conduct subsequent to the signing.
The interpretation of the agreement sought to be introduced by defendant’s president would be admissible solely as to the intent of the agreement, but cannot be admitted to vary the terms of the agreement. Although Tranquillo may be truthful in his assertions, the agreement discusses generally the work that A&R would be expected to provide as “Special Outside General Counsel.”
B. Permissible Legal Fee Arrangements
The leading experts in the United States on permissible fee arrangements by lawyers are Professor Lester Brickman, Professor of Law at Cardozo School of Law and legal ethics expert, and Professor Lawrence A. Cunningham, Professor of *785 Law and Business at Boston College. Their joint writings have been approvingly cited and relied upon by courts of other jurisdictions in decisions discussing what fees lawyers may permissibly recover for their time and services (see, Brickman and Cunningham, Nonrefundable Retainers: Impermissible Under Fiduciary, Statutory and Contract Law, 57 Fordham L Rev 149 [1988]; Brickman and Cunningham, Nonrefundable Retainers Revisited, 72 NC L Rev 1 [1993], described as “the leading article on this topic” by the court in Levisohn, Lerner, Berger & Langsam v Medical Taping Sys., Inc., 20 F Supp 2d 645 [SD NY 1998] [hereinafter Levisohn, Lerner\; brief of amicus curiae in Matter of Cooperman, 83 NY2d 465 [1994]; Brickman and Cunningham, Nonrefundable Retainers: A Response to Critics of the Absolute Ban, 64 U Cin L Rev 11 [1995]; Brickman and Cunningham, Game Theory and Nonrefundable Retainers: A Response to Professors Croson and Mnookin, 2 Harv Negotiation L Rev 69 [1997], cited in the cases such as Kelly v MD Buyline, Inc., 2 F Supp 2d 420 [SD NY 1998]; In re Sather, 3 P3d 403 [Sup Ct, Colo 2000] [en banc]; Matter of Cooperman, 83 NY2d 465, supra).
Lawyers may legally charge for their availability. Simply for making themselves available to a client, attorneys may recover a fee, without regard to the actual time, effort, or energy that they expend. These types of agreements are called “general retainers” or “engagement retainers” (Levisohn, Lerner, 20 F Supp 2d at 651; In re Sather, 3 P3d at 410). In “general retainer” or “engagement retainer” arrangements, the lawyer is being compensated simply for his promise to be available to the client when needed (see, e.g., Atkins & O’Brien v ISS Intl. Serv. Sys., 252 AD2d 446 [1st Dept 1998]). Clients make this arrangement for a variety of motives. First, a general or engagement retainer may be an inducement to take on a particular client’s case. Second, it may be earned for placing the client’s work at the top of the lawyer’s other obligations and workload. Third, clients often pay such a retainer as a means of preventing a prominent, sought-after attorney from being retained by the opposing party (In re Sather, 3 P3d at 410).
The fee paid for availability is “earned when paid” (Nonrefundable Retainers Revisited, 72 NC L Rev at 6, 9, 22, 24; Kelly v MD Buyline, Inc., 2 F Supp 2d at 449, quoting from several Brickman and Cunningham works). The general retainer is not some windfall for the attorney. In signing a general retainer, the lawyer makes two important sacrifices. First, he agrees implicitly to turn down other work opportunities that might *786 interfere with his ability to perform the retainer-client’s legal needs. Second, he gives up the right to be retained by a host of clients whose interests might conflict with those of the retainer-client (Kelly, 2 F Supp 2d at 449).
The second category of fees is a specific retainer. In a specific retainer, a client hires an attorney for representation in a specific, identifiable legal matter, action, or proceeding (Levisohn, Lerner, 20 F Supp 2d at 651).
A third type of retainer, not involved in the present case, is a nonrefundable retainer, where the client pays a fee in advance of the service being performed, and it is denominated by the lawyer as nonrefundable whether the client discontinues the representation or whether the lawyer does any work (id. at 650). The per se invalidity of nonrefundable special retainer agreements was first established in Matter of Cooperman (83 NY2d 465, supra).
The present case presents a mixture of a general retainer and a specific retainer. The signed agreement discloses that A&R was designated as “Special Outside General Counsel” and enumerated what services were covered. The entire import of the terms evidenced that Trancamp would have the availability of A&R. Yet, at the same time, the agreement contemplated that A&R would undertake collection efforts on behalf of Trancamp. The agreement stated, in pertinent part:
“We will assist you in your receivable collections (exceeding 120 days outstanding debt), including phone calls, collection letters and/or preparation of endorsed complaints to accompany our correspondence, where appropriate. If we collect the sums due up to the point of instituting litigation, there will be no additional fees owed.”
The agreement thus contemplated that A&R would make itself available to defendant and that it would also perform work. In short, the agreement in the present case is a “ ‘hybrid’ general retainer” or, alternatively called, a “general-special hybrid agreement,” where the parties agree that “part or all of the general retainer fee [will] be applied to the bill for any services actually performed” (Nonrefundable Retainers Revisited, 72 NC L Rev at 6; accord, Levisohn, Lerner, 20 F Supp 2d at 652 n 4; Kelly, 2 F Supp 2d at 450).
Professors Brickman and Cunningham, in their outstanding contributions to the subject matter, maintain that enforcement of a hybrid agreement should be subject to close scrutiny, governed by a rebuttable presumption that any moneys *787 retained by counsel are for services, rather than availability (see Nonrefundable Retainers Revisited, 72 NC L Rev at 20; Kelly, 2 F Supp 2d at 450).
Defendant’s president, in the case at bar, contends that “[ijnstead of making substantial efforts at dunning, phoning, and non-litigated collections, [A&R] characteristically sent a letter or two, then went straight to suit, where he could bill [Trancamp] for time.” This charge warrants discovery on the services actually performed by A&R during the period of engagement.
In the final analysis, the yardstick for recovery of a general-specific hybrid agreement is quantum meruit, for the reasonable value of the services performed by the law firm (see, Levisohn, Lerner, 20 F Supp 2d 645; Cohen v Radio-Electronics Officers Union, Dist. 3, NMEBA, 146 NJ 140, 164-165, 679 A2d 1188, 1200 [1996]).[3]
Finally, the client has the right to terminate his attorney’s services at any time, with or without cause, and thus cannot be compelled to pay damages for exercising such a right (Kelly, 2 F Supp 2d at 444-445, quoting Martin v Camp, 219 NY 170, 174 [1916]).
In sum, the plaintiff’s motion to dismiss the defendant’s counterclaim is denied in all respects. The court directs the parties to engage and cooperate in meaningful and expeditious discovery and then place this case on the trial calendar.

. The court, on its own motion, amends the caption of the action by correcting the name of the defendant from “Tran Camp” to “Trancamp.”

. The court notes that the client’s new attorney failed to sign his name in the space provided for the notarial signature to the client’s affidavit, although the stamped name of the notary public is contained therein. The court will overlook this ministerial error on this occasion and accept the opposition papers.

. In a general retainer situation, a law firm is not restricted to quantum meruit recovery, since in making itself available for the client’s work, it presumably declined other work opportunities and may have incurred additional personnel and office space in reliance on the general retainer-client’s work (Greenberg v Remick & Co., 230 NY 70, 74-75 [1920]; see, Martin v Camp, 219 NY 170 [1916]; see, e.g., Atkins & O’Brien, 252 AD2d 446, supra; accord, Kelly, 2 F Supp 2d at 445). Thus, the unfettered right of a client to terminate the services of his lawyer without financial consequence is limited to the special retainer relationship (Kelly, 2 F Supp 2d at 445, citing Martin, 219 NY at 176).