=================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
-----------------------------------------------------------------
No. 136
In re: Thelen LLP.
_____

Yann Geron, as Chapter 7 Trustee
of the Estate of Thelen LLP,
            Appellant,
        v.
Seyfarth Shaw LLP,
            Respondent.

----------------------------------
No. 137
In re: Coudert Brothers LLP,
        Debtor.
----------------------------------
Development Specialists, Inc.,
        Respondent-Appellant,
----------------------------------
K&L Gates LLP et al.,
        Appellants-Respondents,
----------------------------------
Akin Gump Strauss Hauer & Feld
LLP, et al.,
        Appellants-Respondents.


Case No. 136:
        Howard P. Magaliff, for appellant.
        Michael R. Levinson, for respondent.
        DLA Piper LLP (US) et al.; New York State Bar
Association et al.; Liquidating Trustee for the Dewey & LeBoeuf
Liquidation Trust et al.; Attorneys' Liability Assurance Society,
Inc., amici curiae.


Case No. 137:
        Joel M. Miller, for appellants-respondents K & L Gates
LLP, et al.
        Shay Dvoretzky, for appellant-respondent Jones Day.

David J. Adler, for respondent-appellant.
New York State Bar Association et al.; Attorneys'
Liability Assurance Society, Inc., _amici_ _curiae_.

READ, J.:

The United States Court of Appeals for the Second Circuit has asked us two questions relating to "whether, for purposes of administering [a] . . . related bankruptcy, New York law treats a dissolved law firm's pending hourly fee matters as its property" (In re: Thelen LLP [Geron v Seyfarth Shaw LLP], 736

- 1 -

F3d 213, 216 [2d Cir 2013]).  We hold that pending hourly fee matters are not partnership "property" or "unfinished business" within the meaning of New York's Partnership Law.  A law firm does not own a client or an engagement, and is only entitled to be paid for services actually rendered.

I.

<u>Thelen</u>

On October 28, 2008, the partners of the law firm Thelen LLP (Thelen) voted to dissolve the firm, which was insolvent.  In carrying out the dissolution, Thelen's partners adopted the Fourth Amended and Restated Limited Liability Partnership Agreement ("Fourth Partnership Agreement") and a written Plan of Dissolution.  The Fourth Partnership Agreement provided that it was governed by California law and, unlike its predecessor agreements, included an "Unfinished Business Waiver." The waiver recited that

> "[n]either the Partners nor the Partnership shall have any claim or entitlement to clients, cases or matters ongoing at the time of the dissolution of the Partnership other than the entitlement for collection of amounts due for work performed by the Partners and other Partnership personnel prior to their departure from the Partnership.  The provisions of this [section] are intended to expressly waive, opt out of and be in lieu of any rights any Partner of the Partnership may have to "unfinished business" of the Partnership, as the term is defined in Jewel v Boxer, 156 Cal. App.3d 171 [203 Cal. Rptr. 13] (Cal. App. 1 Dist. 1984), or as otherwise might be provided in the absence of this provision through the interpretation of the [California Uniform Partnership Act of 1994, as amended]."

> This kind of waiver is referred to as a "<u>Jewel</u> Waiver,"

after Jewel v Boxer (156 Cal App 3d 171 [Cal Ct App 1984]), the intermediate appellate court case that inspired it.  Applying the Uniform Partnership Act (UPA), the Jewel court held that, absent an agreement to the contrary, profits derived from a law firm's unfinished business are owed to the former partners in proportion to their partnership interests.  The Thelen partnership adopted the waiver with the

> "hope that, [it would] serve as an inducement to encourage partners to move their clients to other law firms and to move Associates and Staff with them, the effect of which will be to reduce expenses to the Partnership, and to assure that client matters are attended to in the most efficient and effective manner possible, and to help ensure collection of existing accounts receivable and unbilled time with respect to such clients."

Following Thelen's dissolution, 11 Thelen partners joined Seyfarth Shaw LLP (Seyfarth) -- 10 in its New York office and one in California.  The former Thelen partners transferred unfinished matters to Seyfarth, which billed clients for their services.  On September 18, 2009, Thelen filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.

After his appointment as the Chapter 7 trustee of Thelen's bankruptcy estate, Yann Geron (Geron) commenced an adversary proceeding against Seyfarth in the United States District Court for the Southern District of New York.  Geron sought to avoid the "Unfinished Business Waiver" as a

constructive fraudulent transfer under 11 USC §§ 544 and 548 (a)
(1) (B) and California state law, and to recover the value of
Thelen's unfinished business for the benefit of the estate's
creditors.  On the assumption that pending hourly matters were
among a law firm's assets, Geron argued that Thelen's partners
fraudulently transferred those assets to individual partners
without consideration when they adopted the "Unfinished Business
Waiver" on the eve of dissolution.

Seyfarth moved for judgment on the pleadings, arguing
that New York rather than California law defined whether it
received any "property interest."  In a decision dated September
4, 2012, the District Court Judge first agreed with Seyfarth that
New York law governed.  He then concluded that under New York
law, the "unfinished business doctrine" does not apply to a
dissolving law firm's pending hourly fee matters, and that a
partnership does not retain any property interest in such matters
upon the firm's dissolution.  In the Judge's view, to rule
otherwise would "conflict[] with New York's strong public policy
in favor of client autonomy and attorney mobility" (In re Thelen
LLP [Geron v Seyfarth Shaw LLP], 476 BR 732, 742-743 [SD NY
2012]); and "result in an unjust windfall for the Thelen estate,
as 'compensating a former partner out of that fee would reduce
the compensation of the attorneys performing the work'" (id. at
740, quoting Sheresky v Sheresky Aronson Mayefsky & Sloan, LLP,
35 Misc 3d 1201 [A] [Sup Ct NY County 2011]).  He further

observed that "[s]uch an expansion of the [unfinished business] doctrine would violate New York's public policy against restrictions on the practice of law" and "clash directly with New York's Rules of Professional Conduct"; specifically, the rule generally forbidding fee splitting (id. at 740).  Accordingly, the Judge granted Seyfarth's motion for judgment on the pleadings.  The Judge sua sponte certified his order for interlocutory appeal (id. at 745-746).

By decision dated November 15, 2013, the Second Circuit agreed with the District Court that New York law governed the parties' dispute, and asked us to answer two unresolved questions of New York law regarding the applicability and scope of the "unfinished business doctrine"; specifically,

> "Under New York law, is a client matter that is billed on an hourly basis the property of a law firm, such that, upon dissolution and in related bankruptcy proceedings, the law firm is entitled to the profit earned on such matters as the 'unfinished business' of the firm?
>
> "If so, how does New York law define a 'client matter' for purposes of the unfinished business doctrine and what proportion of the profit derived from an ongoing hourly matter may the new law firm retain?" (736 F3d at 225).

#### Coudert

On August 16, 2005, the law firm Coudert Brothers LLP (Coudert) dissolved in accordance with the terms of its partnership agreement.  That same day, the equity partners adopted a "Special Authorization," whereby the equity partners authorized

"the Executive Board . . . to take such actions as it may deem necessary and appropriate, including, without limitation, the granting of waivers, notwithstanding any provisions to the contrary in the Partnership Agreement . . . , in order to:

"a. . . . sell all or substantially all of the assets of . . . the Firm to other firms or service providers, in order to maximize the value of the Firm's assets and business;

"b. wind down the business of the Firm with a view to continuing the provision of legal services to clients and the orderly transition of client matters to other firms or service providers, in order to maximize the value of the Firm's assets and business to the extent practicable."

Coudert partners were subsequently hired by several different firms. As of the date of the firm's dissolution, there remained between Coudert and its clients partly performed contracts for the provision of legal services. When former Coudert partners joined other firms, those firms were retained by Coudert's former clients to conclude these unfinished legal matters. The client matters were completed by the new firms on an hourly basis, with only two exceptions.

In September 2006, Coudert filed for protection from its creditors pursuant to Chapter 11 of the Bankruptcy Code. Developmental Specialists, Inc. (DSI), as administrator of Coudert's bankruptcy estate, brought 13 separate adversary proceedings against the firms that had hired the former Coudert partners. These lawsuits were premised on the unfinished business doctrine. More specifically, DSI argued that the defendant firms were liable to Coudert for any profits derived

from completing the client matters that the former Coudert partners brought to those firms.  The firms moved for summary judgment, arguing that the unfinished business doctrine did not apply to matters billed on an hourly basis.  DSI cross-moved for a declaration that the unfinished client matters were Coudert's property on the day it dissolved.

In a decision dated May 24, 2012, the District Court denied the firms' motion for summary judgment and granted DSI's cross-motion.  The Judge agreed with DSI that

> "[u]nder the Partnership Law, the Client Matters are presumed to be Coudert's assets on the Dissolution Date.  While the Coudert Partnership Agreement could have provided otherwise, it does not; on the contrary, it confirms the statutory presumption, as does the text of the Special Authorization adopted by the partners who voted to dissolve the firm.  In the absence of any evidence that Coudert's partners intended to exclude pending but uncompleted client representations from the firm's assets, DSI is entitled to a declaration that the Client Matters were Coudert assets on the Dissolution Date.  Because they are Coudert assets, the Former Coudert Partners are obligated to account for any profits they earned while winding the Client Matters up at the Firms" (In re: Coudert Brothers LLP [Development Specialists, Inc. v K & L Gates LLP], 477 BR 318, 326 [SD NY 2012]).

Upon the District Court's certification, the law firms appealed.  By order dated December 2, 2013, the Second Circuit certified the same two questions asked in Thelen.

II.

The Role of the Partnership Law

Geron and DSI (collectively, the trustees) base their claims principally on the unfinished business doctrine as

originally articulated and applied by the <u>Jewel</u> court in the context of a law firm dissolution.  The doctrine derives from an interpretation of various provisions of the Partnership Law; primarily, sections 12, 40 (6) (the so-called "no compensation" rule), 43 (1) (the so-called "duty to account") and 66 (1) (a).[1] The trustees also rely on Partnership Law § 4 (4), which directs that the statute "shall be so interpreted and construed as to effect its general purpose to make uniform the law of those states which enact it."

The legislature enacted the Partnership Law in 1919, thereby adopting the UPA, which was approved and recommended to the states by the Conference of Commissioners on Uniform State

---

[1]Section 12 (1) provides that "[a]ll property originally brought into the partnership stock or subsequently acquired, by purchase or otherwise, on account of the partnership is partnership property"; section 12 (2), that "[u]nless the contrary intention appears, property acquired with partnership funds is partnership property."

Section 40 (6) provides that "[n]o partner is entitled to remuneration for acting in the partnership business, except that a surviving partner is entitled to reasonable compensation for his services in winding up the partnership affairs."

Section 43 (1) specifies that "[e]very partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property."

Section 66 (1) (a) specifies that "[a]fter dissolution a partner can bind the partnership . . . [b]y any act appropriate for winding up partnership affairs or completing transactions unfinished at dissolution."

Laws in 1914.  Prior to the Conference's approval and recommendation for adoption of the Revised Uniform Partnership Act (RUPA) in 1994, the UPA had been enacted in every state except Louisiana.  Generally speaking, the unfinished business doctrine provides that profits arising from work begun by former partners of dissolved law firms are a partnership asset that must be finished for the benefit of the dissolved partnership, absent an agreement to the contrary.  The doctrine rests on the legal principle that because departing partners owe a fiduciary duty to the dissolved firm and their former partners to account for benefits obtained from use of partnership property in winding up the partnership's business, they may not be separately compensated.  This rule has been applied by courts in other jurisdictions to both contingent and hourly matters.[2]

Importantly, though, the Partnership Law does not define property; rather, it supplies default rules for how a partnership upon dissolution <u>divides</u> property as elsewhere defined in state law.  As a result, the Partnership Law itself has nothing to say about whether a law firm's "client matters" are partnership property.  When discussing what constitutes "property," we have explained that the

> "<u>expectation of any continued or future business is too</u>
> <u>contingent in nature and speculative to create a</u>
> <u>present or future property interest.</u>  Although property

_____

[2]It is not entirely clear to what extent the post-dissolution attorney fees at issue in <u>Jewel</u> were for hourly or contingency fee matters.

is often described as a 'bundle of rights," or 'sticks,' with relational aspects . . . <u>the ability to terminate the relationship at any time without penalty [] cannot support a finding that a transferrable property right existed</u>" (<u>Verizon New England, Inc. v Transcom Enhanced Servs., Inc.</u> (21 NY3d 66, 72 [2013] [emphases added]).

In New York, clients have always enjoyed the "unqualified right to terminate the attorney-client relationship at any time" without any obligation other than to compensate the attorney for "the fair and reasonable value of the <u>completed services</u>" (<u>In re Cooperman</u>, 83 NY2d 465, 473 [1994] [emphasis added]). In short, no law firm has a property interest in future hourly legal fees because they are "too contingent in nature and speculative to create a present or future property interest" (<u>Verizon New England</u>, 21 NY3d at 72), given the client's unfettered right to hire and fire counsel. Because client matters are not partnership property, the trustees' reliance on Partnership Law § 4 (4) is misplaced. As the District Court Judge in <u>Geron</u> pointed out, "[t]he purpose of [the] UPA is to harmonize partners' duties regarding partnership property, <u>not to delineate the scope of such property</u>" (<u>Geron</u>, 476 BR at 742 [emphasis added]).

The Contingency Fee Cases

Moreover, contrary to the trustees' contentions, New York courts have never suggested that a law firm owns anything with respect to a client matter other than yet-unpaid compensation for legal services already provided. Appellate

Division decisions dealing with unfinished business claims in the context of contingency fee arrangements uniformly conclude that the dissolved partnership is entitled only to the "value" of its services (see Grant v Heit, 263 AD2d 388, 389 [1st Dept 1999]; Shandell v Katz, 217 AD2d 472, 473 [1st Dept 1995]; DelCasino v Koeppel, 207 AD2d 374, 374 [2d Dept 1994]; Dwyer v Nicholson, 193 AD2d 70, 73 [2d Dept 1993]); Kirsch v Leventhal, 181 AD2d 222 [3d Dept 1992] [Levine, J.]).

The Appellate Division has occasionally referred to a contingency fee case as an "asset" subject to distribution (see e.g. Shandell, 217 AD2d at 473; Kirsch, 181 AD2d at 225). But as then-Justice Levine stressed in Kirsch, a former partner "is only entitled to 'the value of his interest at the date of dissolution . . . with interest'" (id. at 226, quoting Partnership Law § 73; see also Santalucia v Sebright Transp., Inc., 232 F3d 293, 298 [2d Cir 2000] ["(I)n a case where a lawyer departs from a dissolved partnership and takes with him a contingent fee case which he then litigates to settlement, the dissolved firm is entitled only to the value of the case at the date of dissolution, with interest. Stated conversely, the lawyer must remit to his former firm the settlement value, less that amount attributable to the lawyer's efforts after the firm's dissolution" (citing Kirsch, 181 AD2d at 225-226)]). The trustees have not cited any New York case in which the law firm was awarded the client matter itself, or any fee not earned by

the law firm's own work.  This is hardly surprising since, as
already discussed, a client's legal matter belongs to the client,
not the lawyer.

    And notably, these cases have involved disputes between
a dissolved partnership and a departing partner, not outside
third parties.  In this context, statements that contingency fee
cases are "assets" of the partnership subject to distribution
simply means that, as between the departing partner and the
partnership, the partnership is entitled to an accounting for the
value of the cases as of the date of the dissolution.  Kirsch,
Shandell and other Appellate Division decisions involving
contingency fee arrangements do not suggest that law firms own
their clients' legal matters, or have a property interest in work
performed by former partners at their new firms.

### Stem v Warren

    The trustees rely heavily on our decision in Stem v
Warren (227 NY 538 [1920]), as did the District Court Judge in
DSI.  But Stem involved claims for breach of fiduciary duty; we
did not hold "that executory contracts to perform professional
services are partnership assets unless a contrary intention
appears" (DSI, 477 BR at 333), or define unfinished client
engagements as partnership property.

    In Stem, one architectural partnership (Reed & Stem)
entered into an agreement with another architectural partnership
(Warren & Wetmore) for the purpose of "secur[ing] a contract for

architectural services in the construction of the Grand Central Station and buildings in connection therewith" (Stem, 227 NY at 542).  The agreement stated that the partnerships would "share and share alike as firms and not as individuals the profits and losses" (id. at 543).  On the same day, the joint venture entered into a separate contract with the railroad company agreeing, among other things, to jointly act as architects for the company. It was the clear intent of the parties that the contract was to be performed notwithstanding the death of Reed, the "executive head" of the joint venture, if this should occur; that is, the agreement between the partnerships contemplated that the joint venture would survive either partnership's dissolution and that the contract with the railroad company would be performed by the survivors.

The joint venture worked on the Grand Central Station project for over seven years before Reed died.  The trial court found that, without consent from Reed's surviving partner or his estate, Wetmore sent the railroad company a proposed new contract that was, in substance, the same as the joint venture's existing contract, except that Warren & Wetmore was named as sole architects.  The railroad company immediately terminated its contract with the joint venture and entered into the new, identical contract exclusively with Warren & Wetmore.

Stem, the surviving partner, filed suit to recover one half of the profits on two separate projects of the joint

venture: the work performed pursuant to the joint venture
agreement and the contract with the railroad regarding Grand
Central Station; and the work performed on what became the
Biltmore Hotel, for which the joint venture had prepared
preliminary plans prior to Reed's death.  We determined that "the
firm of Warren & Wetmore are to be held accountable to the
plaintiff" for the profits from work on Grand Central Station
(id. at 547), but denied Stem compensation from the Biltmore
project for anything other than the value of the actual work
performed (the preliminary plans) by the joint venture before the
dissolution.

Thus, Stem is not a case that defines what makes up the
partnership property or "assets"; it is a breach-of-fiduciary
duty case in which one joint venturer underhandedly cut a
surviving joint venturer out of a contract expressly intended
(including by the client) to survive dissolution.  We
specifically held that as a result of Wetmore's "breach of duty,"
Warren & Wetmore was liable to account to the joint venture for
the usurped opportunity.  We recited that the railroad contract
was intended to survive Reed's death[3] and, from that, concluded
that the surviving members of the joint venture had a duty to

---

[3]By contrast, contracts between a law firm and a client
cannot contemplate survival of the law firm's dissolution without
impermissibly infringing the client's right to terminate an
attorney at will (see Demov, Morris, Levin & Shein v Glantz, 53
NY2d 553, 556 [1981]).

complete the contract for the joint venture's benefit.  Stem does not hold that the joint venture "owned" the railroad contract to the exclusion of others; rather, we decided that Stem's former joint venturers (Warren & Wetmore) did not have the right to exclude him from the contract.  Certainly, if the railroad had terminated its contract with the joint venture and hired a new, unrelated firm, nothing in Stem suggests that Stem could have pursued the new firm to recover a percentage of its profits.

### Public Policy Considerations

Treating a dissolved firm's pending hourly fee matters as partnership property, as the trustees urge, would have numerous perverse effects, and conflicts with basic principles that govern the attorney-client relationship under New York law and the Rules of Professional Conduct.  By allowing former partners of a dissolved firm to profit from work they do not perform, all at the expense of a former partner and his new firm, the trustees' approach creates an "unjust windfall," as remarked upon by the District Court Judge in Geron (476 BR at 740).

Next, because the trustees disclaim any basis for recovery of profits from the pending client matters of a former partner who leaves a troubled law firm before dissolution, their approach would encourage partners to get out the door, with clients in tow, before it is too late, rather than remain and work to bolster the firm's prospects.  Obviously, this run-on-the-bank mentality makes the turnaround of a struggling firm less

likely.

And attorneys who wait too long are placed in a very difficult position.  They might advise their clients that they can no longer afford to represent them, a major inconvenience for the clients and a practical restriction on a client's right to choose counsel.  Or, more likely, these attorneys would simply find it difficult to secure a position in a new law firm because any profits from their work for existing clients would be due their old law firms, not their new employers.

The trustees answer that clients do not care whether they pay one law firm or another, so long as their legal affairs are handled properly, and that requiring law firms to forfeit the fees earned by their lawyers' efforts has no impact on attorneys or clients.  We disagree for the reasons already mentioned. Additionally, clients might worry that their hourly fee matters are not getting as much attention as they deserve if the law firm is prevented from profiting from its work on them.  The notion that law firms will hire departing partners or accept client engagements without the promise of compensation ignores commonsense and marketplace realities.  Followed to its logical conclusion, the trustees' approach would cause clients, lawyers and law firms to suffer, all without producing the sought-after financial rewards for the estates of bankrupt firms.

Ultimately, what the trustees ask us to endorse conflicts with New York's strong public policy encouraging client

choice and, concomitantly, attorney mobility.  In <u>Cohen v Lord, Day & Lord</u> (75 NY2d 95, 96 [1989]), the partnership agreement provided that a departing partner forfeited his right to departure compensation if he practiced law in competition with his former firm.  The lower court held that the provision was a "valid . . . financial disincentive to competition and did not prevent plaintiff from practicing law in New York or in any other jurisdiction" (<u>id.</u> at 97 [internal quotation marks omitted]).

We reversed, holding that these financial penalties impermissibly interfered with clients' choice of counsel -- i.e., "[t]he forfeiture-for-competition provision would functionally and realistically discourage and foreclose a withdrawing partner from serving clients who might wish to continue to be represented by the withdrawing lawyer and would thus interfere with the client's choice of counsel" (<u>id.</u> at 98).  In this regard, we quoted approvingly from an opinion of the New York County Lawyers' Association issued in 1943, which stressed that

> "[c]lients are not merchandise.  Lawyers are not tradesmen.  They have nothing to sell but personal service.  An attempt, therefore, to barter in clients, would appear to be inconsistent with the best concepts of our professional status" (<u>id.</u> at 98; <u>see also</u> <u>Denburg v Parker Chapin Flattau & Klimpl</u>, 82 NY2d 375, 381 [1993] [finding unacceptable a provision in a partnership agreement that "improperly deter(red) competition and thus impinge(d) upon clients' choice of counsel" by creating an incentive for a partner changing firms to discourage a Parker Chapin client from coming along]).

Finally, the trustees seek to entice us to hold in their favor on the ground that a law firm may always avoid the

unfinished business doctrine by placing a well-crafted <u>Jewel</u>
waiver in the partnership agreement.  This suggestion fails to
consider the possibility that classifying clients' pending hourly
fee matters as firm property may lead to untoward unintended
consequences.  For example, the trustees, as noted before, limit
their sought-after recoveries to client matters that remain
unresolved as of the date of a law firm's dissolution.  As
Seyfarth pointed out, though, if a client's pending matter is
partnership property, why doesn't every lawyer whose clients
follow him to a new firm breach fiduciary duties owed his former
law firm and partners?  In the end, the trustees' theory simply
does not comport with our profession's traditions and the
commercial realities of the practice of law today, a deficiency
beyond the capacity of a <u>Jewel</u> waiver to cure.

Accordingly, the first certified question should be
answered in the negative, and the second certified question
should not be answered as it is unnecessary to do so.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

<u>For Each Case</u>:  Following certification of questions by the
United States Court of Appeals for the Second Circuit and
acceptance of the questions by this Court pursuant to section
500.27 of this Court's Rules of Practice, and after hearing
argument by counsel for the parties and consideration of the
briefs and the record submitted, first question answered in the
negative and second question not answered as unnecessary.
Opinion by Judge Read.  Chief Judge Lippman and Judges Graffeo,
Smith, Pigott, Rivera and Abdus-Salaam concur.

Decided July 1, 2014